United States Court of Appeals,

Fifth Circuit.

No. 95-40721.

STATE OF TEXAS, on its own behalf and on behalf of all Texans as parens patriae;  George W. Bush, Governor of the State of Texas;  La Joya Independent School District, on their own behalf and as class representatives of all independent school districts of Texas;  Harris County Hospital District;  Dallas County Hospital District;  Bexar County Hospital District, on their own behalf and as class representatives of all Hospital Districts in Texas;  Harris County;  Dallas County;  Hidalgo County, on their own behalf and as class representative of all counties in Texas;  The City of Odessa, on its own behalf and as class representative of all municipalities in Texas, Plaintiffs-Appellants,

v.

UNITED STATES of America;  Janet Reno, U.S. Attorney General;  Doris Meissner, Commissioner of the Immigration and Naturalization Service;  Michael S. Williams, Director of Immigration and Naturalization Service's Texas Regional Office;  Ronald C. Chandler, Immigration and Naturalization Service's District Director of the Houston District;  Robert A. Wallis, Immigration and Naturalization Service's District Director of the Houston District;  Richard M. Casillas, Immigration and Naturalization Service's District Director of the San Antonio District;  Alice Rivlin, Director, Office of Management and Budget;  Margaret M. Richardson, Commissioner of the Internal Revenue Service, Defendants-Appellees.

Feb. 28, 1997.

Appeal from the United States District Court for the Southern District of Texas.

Before POLITZ, Chief Judge, and JOLLY and BARKSDALE, Circuit Judges.

POLITZ, Chief Judge:

The State of Texas and its political subdivisions (collectively, "the State")[1] appeal a Fed.R.Civ.P. 12(b)(6)

---

[1]The suit was brought as a class action by the State of Texas on behalf of all Texans;  the Governor;  one school district on behalf of all Texas school districts;  three hospital districts on behalf of all Texas hospital districts;  three counties on behalf

dismissal of their complaint seeking declaratory and injunctive relief which would require that the United States pay the educational, medical, and criminal justice expenses allegedly incurred as a result of the presence of undocumented or illegal aliens in Texas. Concluding that the complaint raises questions of policy rather than colorable claims of constitutional or statutory violations, we affirm.

*Background*

The amended complaint alleges that hundreds of thousands of undocumented immigrants live in Texas as the direct consequence of federal immigration policy. The State alleges that federal defendants have violated the Constitution and immigration laws by failing to control illegal immigration and by failing to reimburse Texas for its educational, medical, and criminal justice expenditures on undocumented aliens. The State seeks an order enjoining federal defendants from failing to pay for these alleged financial consequences of federal immigration policy and requiring prospective payment as well as restitution for the State's relevant expenditures since 1988. These expenditures are estimated at $1.34 billion for 1993 alone.

The complaint alleges breach of duties imposed by the naturalization clause of the Constitution, specifically the duty to

of all Texas counties; and the City of Odessa, seeking to represent Texas municipalities. Defendants are the United States; the Attorney General; the Immigration and Naturalization Service Commissioner and four INS officials in Texas; the Commissioner of the Internal Revenue Service; and the Director of the Office of Management and Budget. The El Paso Independent School District was denied intervention but was given *amicus* status.

control immigration and to pay for the consequences of federal immigration policy. The complaint also alleges that defendants have commandeered State resources in violation of the tenth amendment and, further, that defendants' failure to pay immigration-related expenditures denigrates Texas' republican form of government, in violation of the Constitution's guaranty clause and the Articles of Annexation for Annexing Texas to the United States. Finally, the complaint alleges that the Attorney General's failure to prevent illegal immigration violates the Immigration and Nationality Act.

The district court dismissed this action on three grounds: (1) the claims present nonjusticiable political questions; (2) the plaintiffs lack standing; and (3) the complaint fails to state a claim on which relief can be granted.[2] The State timely appealed.

*Analysis*

A complaint should not be dismissed under Rule 12(b)(6) for failure to state a claim unless it appears certain that no set of facts can be proved entitling plaintiffs to relief.[3] For purposes of our *de novo* review of the order of dismissal we accept the complaint's factual allegations as true, cautioning that conclusionary allegations alone will not pass muster.[4]

---

[2]For purposes of today's disposition we assume, without deciding, that the plaintiffs have standing.

[3]*Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

[4]*Campbell v. City of San Antonio,* 43 F.3d 973 (5th Cir.1995).

Arizona, California, Florida, New Jersey, and New York have brought similar actions seeking federal reimbursement for expenses allegedly incurred as a result of illegal immigration.[5] All of these actions were dismissed by the trial court for failure to state a colorable claim or as presenting nonjusticiable political questions. All were affirmed on appeal by our colleagues in the Second, Third, Ninth, and Eleventh Circuits.

*Naturalization Clause*

The naturalization clause, article I, section 8, clause 4 of the Constitution provides that Congress "shall have Power ... To establish an uniform Rule of Naturalization." The clause is a principal source of the broad authority of Congress over immigration matters, a discretionary authority subject to limited judicial review.[6] Our colleagues in the Second and Third Circuits have found similar naturalization clause claims seeking federal reimbursement to be nonjusticiable and lacking in merit.[7]

A judicial action presents a nonjusticiable political question not amenable to judicial resolution where there is "a

---

[5]*Arizona v. United States,* 104 F.3d 1095 (9th Cir.1997); *California v. United States,* 104 F.3d 1086 (9th Cir.1997); *New Jersey v. United States,* 91 F.3d 463 (3d Cir.1996); *Padavan v. United States,* 82 F.3d 23 (2d Cir.1996); *Chiles v. United States,* 69 F.3d 1094 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1674, 134 L.Ed.2d 777 (1996). Each of these cases omitted some of the counts in the instant complaint or included other claims not present here.

[6]*Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 102 L.Ed.2d 563 (1982); *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977).

[7]*New Jersey; Padavan.*

textually demonstrable constitutional commitment of the issue to a coordinate political department;  or a lack of judicially discoverable and manageable standards for resolving it...."[8] Nonjusticiability based on commitment of the issue to a coordinate political department generally entails a finding that the Constitution confers thereon final authority over the question at issue, to the exclusion of the judiciary.[9]  A holding that a case presents a nonjusticiable political question is "very different from determining that specific congressional action does not violate the Constitution.  That determination is a decision on the merits that reflects the *exercise* of judicial review, rather than the *abstention* from judicial review that would be appropriate in the case of a true political question."[10]  We are not aware of and have difficulty conceiving of any judicially discoverable standards for determining whether immigration control efforts by Congress are constitutionally adequate.

Were we to assume, *arguendo,* the justiciability of this claim, judicial review of congressional and executive action in the immigration arena is limited.  " "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over'

---

[8]*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

[9]*See Nixon v. United States,* 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993).

[10]*United States Dep't of Commerce v. Montana,* 503 U.S. 442, 458, 112 S.Ct. 1415, 1425, 118 L.Ed.2d 87 (1992) (footnote omitted).

the admission of aliens."[11]  Courts must give special deference to congressional and executive branch policy choices pertaining to immigration.[12]

We conclude that the naturalization clause claims lack merit. Neither the language, history, nor judicial interpretations of the clause support the contention that it imposes a reimbursement duty on the federal government.[13]  The State would find support for its novel theory in a resolution by the House of Representatives stating that inadequate immigration law enforcement has imposed on state and local governments financial costs which the federal government has an obligation to reimburse.[14]  A congressional resolution cannot create a constitutional duty.  The State also contends that article I, section 8 of the Constitution implies the authority to carry out all functions necessary to reach the objective of Congress' powers, and that payment of immigration-related expenses is a necessary function of the naturalization power.  Although the grant of broad powers to Congress by the naturalization clause undoubtedly includes the discretion to decide whether to appropriate funds to states for the expenses at issue, we perceive no basis for reading into the clause

---

[11]*Fiallo,* 430 U.S. at 792, 97 S.Ct. at 1478 (quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)).

[12]*Fiallo.*

[13]*New Jersey;  Padavan.*

[14]H.R.Con.Res. 218, 103d Cong., 2d Sess., 140 Cong.Rec. 1210 (1994).

an affirmative duty to do so.

*Tenth Amendment Claim*

The tenth amendment ensures that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Congress may not assume control over the legislative processes of the states by directly compelling them to enact and enforce a federal regulatory program.[15] The tenth amendment promotes accountability to the electorate. "[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision."[16]

The State contends that federal defendants have commandeered its financial resources by forcing it to provide services to undocumented aliens. According to the State, inadequate enforcement of immigration laws presents the State with a Hobson's choice: to pay medical and correctional expenses of undocumented aliens or to place at risk the public health and safety.

We hold that in the absence of a federal statute or regulation or executive branch directive specifically compelling states to provide services to undocumented aliens, the federal government

---

[15]*New York v. United States,* 505 U.S. 144, 160-61, 112 S.Ct. 2408, 2420, 120 L.Ed.2d 120 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 287-89, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)).

[16]*New York* at 169, 112 S.Ct. at 2424.

cannot be said to have commandeered state legislative processes in violation of *New York v. United States.* We agree with our colleagues in the Second, Third, Ninth, and Eleventh Circuits that state expenditures on medical and correctional services for undocumented immigrants are not the result of federal coercion.[17] The State's correctional expenses stem from its enforcement of its own penal laws, not federal laws, and federal law requires states to provide emergency medical care to undocumented aliens only if the states voluntarily choose to receive federal funds from the Medicaid program.[18] The Supreme Court has recognized that the tenth amendment permits Congress to attach conditions to the receipt by the states of federal funds that have the effect of influencing state legislative choices.[19] "[T]o hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties."[20] This we will not do.

Finally, the State's public education expenditures for the children of undocumented aliens are required by the equal protection clause rather than by actions of the federal defendants.[21] A duty imposed on states by the Constitution can hardly be said to violate the tenth amendment's reservation of

---

[17]*Padavan; New Jersey; California; Chiles.*

[18]*California; Padavan.*

[19]*New York; South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).

[20]*Dole* at 211, 97 S.Ct. at 2798 (quotation omitted).

[21]*See Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

8

unenumerated powers to the states.[22] Accordingly, the State has not alleged a cognizable claim of violation of the tenth amendment.[23]

*Guaranty Clause Claims*

The complaint alleges that federal immigration policy and defendants' failure to pay for state expenditures related to undocumented aliens infringes on the right of Texas voters to determine the spending priorities of state government in violation of the guaranty clause of the Constitution and the Articles of Annexation for Annexing Texas to the United States. The guaranty clause, article IV, section 4, provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government."

Although the Supreme Court has suggested that perhaps not all claims under the guaranty clause present nonjusticiable political questions, in the main the Court has found that such claims are not judicially enforceable.[24] In cases seeking federal reimbursement for states' immigration-related expenses, the Second, Ninth, and Eleventh Circuits have held guaranty clause claims nonjusticiable.[25] The State suggests no manageable standards by which a court could decide the type and degree of immigration law enforcement that would suffice to comply with its strictures. Whatever might be the

---

[22]*Puerto Rico v. Branstad,* 483 U.S. 219, 107 S.Ct. 2802, 97 L.Ed.2d 187 (1987).

[23]*California; Padavan.*

[24]*New York* at 182-86, 112 S.Ct. at 2432-33.

[25]*Padavan; California; Chiles.*

decision in other cases in other settings, we are persuaded that the case now before us does not present a justiciable claim of violation of the guaranty clause.

Further, were we to assume that the present complaint is justiciable, it fails to allege a realistic risk of denying to Texas its guaranteed republican form of government. The defendants are not *mandating* the State to take any action with respect to undocumented aliens. Any inaction by the federal government with respect to immigration enforcement or payment of state expenditures cannot realistically be said to pose a meaningful risk of altering the Texas government's form or method of functioning. The Texas electorate is not being deprived of the opportunity to hold state and federal officials accountable at the polls for their respective policy choices. We must conclude that the complaint fails to state a violation of the guaranty clause or the Articles of Annexation.

*Statutory Claim*

Finally, the State alleges that the Attorney General has breached a nondiscretionary duty to control immigration under the Immigration and Nationality Act.[26] The State candidly concedes, however, that section 1103 places no substantive limits on the Attorney General and commits enforcement of the INA to her discretion.[27]

The State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting

---

[26]8 U.S.C. § 1103.

[27]*Chiles; see also California.*

10

therefrom is not subject to judicial review. An agency's decision not to take enforcement actions is unreviewable under the Administrative Procedure Act[28] because a court has no workable standard against which to judge the agency's exercise of discretion.[29] We reject out-of-hand the State's contention that the federal defendants' alleged systemic failure to control immigration is so extreme as to constitute a reviewable abdication of duty. The State does not contend that federal defendants are doing nothing to enforce the immigration laws or that they have consciously decided to abdicate their enforcement responsibilities. Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty.[30]

The judgment appealed is AFFIRMED.

---

[28]5 U.S.C. §§ 701-706.

[29]*Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

[30]*See Heckler.*